# In the United States Court of Federal Claims

NOT FOR PUBLICATION

No. 07-348C
(Filed: February 20, 2008)

* * * * * * * * * * * * * * * * * * * * * *

ESSEX ELECTRO ENGINEERS, INC.,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * *

*Charles E. Raley*, Hilton Head Island, South Carolina, for plaintiff.

*Matthew H. Solomson*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom was *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Brian M. Simkin*, Assistant Director, of counsel; *Captain Christy Kisner*, U.S. Department of the Air Force, agency counsel.

OPINION

BRUGGINK, *Judge*.

This is an action arising out of a contract for the production of electric generator sets for the Air Force. The contract was fully performed, but modifications to add new requirements led to the filing of a claim under the Contract Disputes Act ("CDA").[1] The parties settled that claim, and what remains now on dispositive cross-motions is resolution of plaintiff's demand

---

[1] 41 U.S.C. §§ 601-613 (2000).

for additional interest under either the Prompt Payment Act ("PPA")[2] or the CDA. The matter has been fully briefed and oral argument was held on February 12, 2008. For the reasons set out below, we grant defendant's motion for summary judgment.

## BACKGROUND[3]

The United States, acting through the Department of the Air Force, awarded fixed price Supply Contract No. F04606-94-D-0401 ("contract") to plaintiff, Essex Electro Engineers, Inc. ("Essex") on September 30, 1994. The contract was a 100% small business set aside. The Contracting Officer ("CO"), Martha Hargis, issued modifications to the contract that resulted in delays to Essex's performance. The contract's original completion date was August 24, 1997, but due to the modifications, Essex completed the contract in January 2002. On June 26, 2000, Essex submitted a CDA claim to the CO for an equitable adjustment due to the delays.

The matter apparently languished. The first document offered by the parties addressing the claim is a memorandum dated April 20, 2006. In it, the CO, Ms. Hargis, addressed Essex's claims with a settlement offer: "In an effort to effect a complete and final settlement of all issues outstanding against the contract, the Government is prepared to make an offer for your consideration." (Def.'s Resp. to Pl.'s Proposed Findings of Fact Att. 1 at 1.) The government's offer was made conditional on the "understanding and acceptance that in the event that parties reach an agreement on the settlement of this claim, such agreement will constitute full and complete settlement of all outstanding claims against the Government on this contract." (*Id.*)

One month later, during a telephone conference on May 18, 2006, counsel for plaintiff, Mr. Charles Raley, and the CO agreed verbally to a settlement figure of $1,164,832.00, plus CDA interest accrued between June 26, 2000 and May 18, 2006. On May 19, 2006, plaintiff's counsel, Mr. Raley, sent Ms. Hargis, an e-mail to "confirm[] the results of [their] teleconference in the afternoon on May 18, 2006." (Pl.'s Proposed Findings of Fact App. at 2.) Mr. Raley's e-mail states:

---

[2]31 U.S.C. §§ 3901-3907 (2000).

[3]The background facts have been taken from the parties' proposed findings of fact, to the extent they are undisputed.

> Essex and the Government agree to a full and final settlement of the pending Claim and any other issues arising under the subject Contract F04606-94-F0401 upon the Government's payment to Essex of $1,164,832.00 plus CDA interest on that amount from June 26, 2000, to and including May 18, 2006. The total payment will be made as soon as possible using the Government's best efforts. In the absence of the required payment within a reasonable period of time, this agreement will be enforceable as a stipulation of Essex's entitlement and quantum. This morning you will be providing an e-mail to me confirming this agreement. Based on this agreement Essex will not proceed to file its Complaint in the U.S. Court of Federal Claims as had been stated in our letter of May 16, 2006.

(*Id.*) Plaintiff's counsel thus records that no fixed date of payment was agreed upon. Instead, the government would use its best efforts to make payment "within a reasonable period of time."

On the same day, Ms. Hargis replied by e-mail:

> This email confirms the Government's agreement to settle this claim for the amount specified in your email . . . including CDA interest up to and including May 18, 2006. As stated to your [sic] yesterday, we have negotiated a settlement which will utilize funds which do not belong to this organization. We are in the process of determining the amount of interest so that we will know the total amount of funding required and, when that number is known, we will request funding in that amount. I will advise you of the estimated time to obtain the funding as soon as I possibly can. I will also need to discuss with you or Mr. Pawlowski what is the best way to modify the contract to make the billing and payment of these funds as simple as possible so that this whole issue can be closed out. I'm not sure if we will need Essex to execute a Certificate of Current Cost or Pricing Data but, if required, we will expect that as a part of the final close out of this issue.

(*Id.*)

Thereafter Mr. Raley and Ms. Hargis exchanged a series of e-mails. It is apparent from them that there was agreement on the principal amount, on the running of CDA interest for a fixed period ending on May 18, 2006, and that the parties contemplated execution of a written, bilateral modification to the contract to confirm the agreement. What remained uncertain was the date payment would be made.

On May 31, 2006, Ms. Hargis wrote to Mr. Raley:

> This contract as [sic] funded with FY93/95 funds which are now cancelled. Consequently, we must obtain funding out of current year dollars through our Obligation Adjustment Reporting System (OARS). This is also complicated by the fact that there are several funds citations on the contract and they utilize BP 12, FMS and 616 dollars which means that funds must be obtained proportionately, if possible, from all sources. I have sought and am receiving assistance from our Financial Management office and also from the current Program Manager. Please be assured that obtaining these funds is a top priority not only with me but with our senior management. I realize this claim has been around for a long time; however, obtaining these funds may take a little time also. While I do not expect Essex to wait an inordinate amount of time and will do everything in my power to expedite receipt of the funding, I must have your firm commitment to the dollars set forth above [$1,508,107.99]. It will serve no useful purpose for me to seek this funding and obtain it and then Essex not accept it because it has taken the Government time to obtain the funds. Obviously this is a "must pay" bill and we will obtain funding through some method; it is just likely to take several courses of action to do so. With your agreement, we will proceed and will diligently seek this funding. I will also keep you advised of each action and the status. Please understand that the Government does not expect you to wait an unreasonable amount of time and will definitely entertain discussions of additional interest if that should be the case. But, for today's effort and for a period of 60 days, I need your definite commitment to the above figure.
>
> . . . . I realize we settled 12 days ago but, due to the holidays and key personnel being on leave, I have been unable to obtain

> instructions as to what method the program office plans to pursue until today.

(*Id.* at 4.) On the same day, Mr. Raley responded: "We confirm that the settlement amount plus interest to and including May 18, 2006, totals the sum of $1,508,107.99 as agreed. We also will allow a period of no more than 60 days from May 18, 2006, in order for the funding modification and payment to occur." (*Id.* at 3.)

As of May 31, 2006, it was clear that the parties recognized that plaintiff would only be bound to the principal amount, plus the fixed interest, through July 17, 2006. Ms. Hargis understood that, beyond that point, plaintiff reserved the right to ask for additional interest.

In July, Mr. Raley and Ms. Hargis exchanged further e-mails. On July 10, 2006, Mr. Raley wrote to Ms. Hargis:

> With respect to your last communication, below, I note that, because of the BRAC closings, the complete Contract and PCO responsibility was transferred to Warner Robins on August 24, 2000. I also note that it is now one week until the settlement payment date of July 17, 2006.
>
> Consequently, it appears reasonable to take certain immediate actions. First, please advise of the amount of the necessary funds identified to date. Second, a partial funding Modification and payment of the identified funds should be issued promptly with the balance to be paid upon identification with interest. Instructions need to be given to DFAS for an immediate payment upon receipt of Essex's invoice.

(*Id.* at 6.)

Mr. Raley was thus proposing a slightly different approach. Whatever sum could be funded in the short term would be paid immediately, but any unpaid principal would continue to earn interest beyond the fixed amount already agreed upon. On July 12, 2006, Ms. Hargis responded to that suggestion in the following e-mail to Mr. Raley:

> Mr. Raley, the funds have been identified and appropriate action to obtain these funds is being taken. We are aware of the July 17, 2006 settlement payment date and have made sure the appropriate management is aware. I am in the process of completing the modification and sending it through the necessary approval levels. I will advise you as soon as the funds are made available and the modification is ready for signature. Are you authorized by Essex to sign the modification on their behalf? If not, please advise who will sign it. If you are, please have either Mr. Frank Pawlowski or Mr. Glenn Pawlowski advise me of this authorization.

(*Id.*) We take this e-mail to be a rejection of the idea of partial payment. The funding sources had been identified and efforts were being made to secure complete payment.

In an e-mail dated July 12, 2006, plaintiff's counsel wrote to the CO: "The most expeditious procedure would be to Fax a copy of the draft modification to me for review this afternoon. I will let you know by e-mail this afternoon if the modification is acceptable as drafted and the answer to your question regarding authority to sign for Essex." (*Id.* at 5.) Plaintiff's counsel further responded with another e-mail dated July 12, 2006: "You should soon receive an e-mail from Glenn Pawlowski authorizing me to sign the Modification and submit an Invoice for the amount due and a Certificate of Current Cost or Pricing Data signed by him." (*Id.*)

On July 17, 2006, the CO issued contract Modification P00007. It had the effect of authorizing the funding of the contract settlement. It changed Contract Schedule B for Supplies or Services by adding Contract Line Item Number ("CLIN") 0009 for $1,164,832.00 for "unabsorbed overhead due to Government caused delay" and CLIN 0010 for $343,275.99 in interest on the settlement amount "[f]rom date of certification of Claim (26 Jun[e] 2000) through [d]ate of settlement (18 May 2006)." (Def.'s Mot. to Dismiss Ex. A at 2.) The contract modification provided that "payment should be made AS SOON AS POSSIBLE," *id.* at 1, and also included the following clause:

> In consideration of the modification agreed to herein as complete settlement of the Contractor's claim dated 25 May 2000 and certified 26 Jun[e] 2000, the Contractor hereby releases the Government from any and all liability under this

> contract for further equitable adjustments or claims attributable to the facts or circumstances giving rise to the claim.

(*Id.* at 2.) Plaintiff's counsel signed the modification.[4] The terms of the parties' agreement thus were that the parties would settle plaintiff's claims for $1,508,107.99 in exchange for a release of all further liability. Payment had to occur "as soon as possible," but no specific deadline was fixed and no provision was made for further interest. Plaintiff thus appeared to have abandoned its prior insistence on new interest accumulation if payment was made after July 17.

Two other relevant documents were executed on July 17, 2006. Essex submitted its Invoice "B809-CLAIM" for payment of the amounts on CLIN 0009 and CLIN 0010 in Modification P00007, stating that payment was due July 17, 2006, "upon receipt of this invoice." (Pl.'s Proposed Findings of Fact App. at 8.) Also on July 17, the CO issued Form 1155, entitled "ORDER FOR SUPPLIES OR SERVICES." A column on the form, entitled "SCHEDULE OF SUPPLIES/SERVICES," includes a "NOTE TO DFAS: This order represents payment for settlement of a claim pursuant to the Contract Disputes Act. As such, payment [m]ust be made as soon as possible after receipt of the contractor's invoice."[5] (*Id.* at 9.)

Payment was not immediately forthcoming. It was not received until August 30, 2006. Ten days later, on September 11, 2006, Essex submitted a written demand for additional interest on the principal amount. Citing Federal Acquisition Regulation ("FAR")[6] 32.907-1(c)(1), Essex explained that under "FAR 32.903-1(a)(3) ["unique circumstances"] &(5)["accelerated payment"] and 5 CFR § 1315.5(b) [Essex being a Small Business] and directed by the subject Modifications/Amendments, making contract payments by DFAS is possible as soon as 7 days after receipt of an invoice, see FAR 32.908(c)(2)." (*Id.* at 13.) In plaintiff's view, these regulatory provisions had the effect of requiring payment of additional interest beginning on July 24, 2006, seven

---

[4]Mr. Raley's signature is dated July 14, three days before the CO's signature.

[5]DFAS (Defense Finance and Accounting Service) is the relevant payment agency.

[6]The FAR is codified in Title 48 of the Code of Federal Regulations.

days after the receipt of the invoice. Essex further claimed that, "[u]nder the 30 day compounding provisions of FAR 32.907 and 5 CFR § 1315.10, Late Payment Interest was automatically due on the principle payment date . . ." in the amount of $8,678.55, along with an "Additional Penalty . . . under FAR 32.907 and 5 CFR § 1315.11(b)" in the amount of $13,678.55. Mr. Dennis Gaither, the contact person for DFAS, refused to pay the claimed late payment interest and additional penalty. (*Id.*)

On June 4, 2007, Essex filed its complaint here. It consists of three counts. In Count I, Essex seeks approximately $13,000 for interest, commencing seven days after the July 17 invoice, pursuant to the accelerated payment provisions of the PPA. In Count II, Essex, in the alternative, seeks CDA interest on its original CDA claim, from May 18 through August 30, in the approximate amount of $18,000. In Count III, Essex seeks recovery of approximately $21,000 in fees and costs incurred to settle this matter prior to May 17, 2007. Count III makes no reference to any statutory authority for payment of fees and costs.

Defendant has filed a motion to dismiss plaintiff's claim for interest on the settlement payment under the PPA for failure to state a claim upon which relief can be granted. In the alternative, defendant moves for summary judgment on all of plaintiff's claims for interest, costs and fees. Plaintiff has cross-moved for summary judgment.

DISCUSSION

The briefs on the dispositive motions, along with oral argument, have somewhat clarified the nature of plaintiff's claims. It became apparent at oral argument, for example, that the demand for CDA interest is based on the December 2006 CDA claim,

but that this claim is ultimately derivative of the PPA claim.[7] It was counsel's understanding that perfecting the demand for PPA interest required the submission of a new CDA claim. The net effect, as counsel conceded, is that, if the PPA claim fails, there can be no independent CDA claim. Similarly, counsel conceded that there is no independent statutory ground for recovery of costs and fees. If the PPA claim fails, the predicate for Count III also fails. Thus, all the claims for interest, fees and costs depend on resolution of the PPA claim.

Plaintiff is entitled to interest under the PPA, in turn, only if defendant failed to pay on "the date payment is due under the contract." 31 U.S.C. § 3903(a)(1)(A). Resolving the pending motions therefore depends completely on the proper construction and interpretation of the settlement agreement. If the settlement agreement is incompatible with plaintiff's assertion that the settlement amount was "overdue" immediately, then the entire complaint fails.

The parties agree that they settled the underlying CDA delay claim but disagree about whether that occurred in May or July, 2006. Plaintiff takes the position that the May 18 oral agreement is binding. We do not believe it would assist plaintiff if we adopted its view on this point. The asserted oral agreement in May 2006, as reflected in the immediately following e-mails, permits the government a "reasonable period of time" for payment. Nevertheless, for reasons we explain below, we agree with defendant that the only relevant agreement was the written one executed on July 17, 2006. That document, however, also contains "payment . . . as soon as possible" language, although the parties disagree on the effect of those words as well as the release language.

Interpreting a government contract is a matter of law, and the plain language of the contract is controlling. *Grumman Data Sys. Corp. v. Dalton*,

---

[7]The complaint seeks CDA interest on the 2000 CDA claim. The second CDA claim was submitted on December 29, 2006. Irrespective of which CDA claim plaintiff relies on, its demand for interest is problematic. The settlement and release language plainly put an end to any claim for additional interest on the original 2000 claim. Interest on the later claim could only run from the day the CO received it, December 29, 2006, *see* 41 U.S.C. § 611, whereas plaintiff here seeks interest from July 24 through August 30, 2006.

88 F.3d 990, 996 (Fed. Cir. 1996) (citing *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985)). We may examine "the circumstances surrounding [the agreement's] execution, including the negotiations which produced it" to determine whether the parties intended the writing to constitute a final integration of their agreement. *David Nassif Assocs. v. United States*, 557 F.2d 249, 256 (Ct. Cl. 1977). If the parties intend their written agreement to serve as a final and exclusive statement, then "even a consistent prior oral agreement is superseded and overridden by the written agreement." *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1006 (1972).

Plaintiff contends that the May 18, 2006 oral agreement expresses the relevant terms of the parties' understanding. The requirement of a writing[8] is satisfied, it contends, by the mutual e-mails of May 19, 2006. Even if the formalities of a written contract are satisfied, there is a problem with plaintiff's argument. It is patent from the language of the e-mails that, while the parties had agreed on a principal amount and a means of calculating CDA interest, they had not fixed a date by which payment was unequivocally due. As Mr. Raley himself recited in his May 19 e-mail, the parties had agreed to no more than that "total payment will be made as soon as possible using the Government's best efforts." If that language constitutes the four corners of the agreement, then, irrespective of whether the oral agreement was binding in other respects, it is insufficient to sustain plaintiff's claim that payment was "overdue," as of July 18.

There is another problem with plaintiff's reliance on the May 18 oral agreement. Two things become clear from the excerpts of the parties' post May 18 communications: first, they intended to enter into a formal written agreement, captured in a contract modification; second, continued uncertainty about when the government would pay the settlement amount led to changes in the parties' positions about what the written agreement would look like. The e-mails indicate that, as late as July, plaintiff's counsel had to provide written assurance that he was authorized to enter into a settlement agreement. In these e-mails, plaintiff also sought to reserve the right to demand interest after July 17. The exchange of e-mails indicates that the parties were still negotiating the terms of the settlement and expected to execute a formal settlement, integrating all terms.

---

[8] 31 U.S.C. § 1501(a)(1)(A); *see also* 48 C.F.R. § 2.101 (2007).

We hold, in short, that Modification P0007 constitutes a final integration of the parties' oral agreement and subsequent negotiations. Any prior agreements are merged into it. For that reason, we need concern ourselves only with the language of the modification, and even then, only with its provision regarding the payment due date. We must ascertain whether the August 30 payment was "overdue" with respect to the time period for payment specified in the contract and for purposes of the PPA.

It cannot be disputed that a key subject of the parties' negotiations between May 18 and July 17 was when payment would be made and whether interest would accrue beyond July 17. Despite plaintiff's warning that the settlement amount was only valid through July 17 and its threat to insist on additional interest beyond that date, it ultimately accepted language obligating the government merely to its best efforts to pay as soon as possible after July 17. Under those circumstances, plaintiff's argument that the parties understood that July 17 was a "drop dead" date from which legal consequence could flow is untenable.

On the assumption that July 17 is the "due date" for purposes of the PPA, plaintiff contends that accelerated payment procedures apply, making interest begin to accrue seven days after receipt of the invoice on July 17. *See* 5 C.F.R. § 1315.5 (2007); 48 C.F.R. § 32.908(c)(2) (2007). Defendant disagrees with the premise of plaintiff's argument. It contends that the PPA does not apply at all because the settlement agreement did not involve property or services,[9] July 17 is not an agreed-upon due date, and finally, even if the PPA applied, the accelerated payment provisions would not apply. As to defendant's final point, we agree that agencies have discretionary authority to implement a seven day time period for payment. *See* 5 C.F.R. § 1315.5(b) ("Agencies *may* pay a small business as quickly as possible, when all proper documentation, including acceptance, is received in the payment office and before the payment due date.") (emphasis added); 48 C.F.R. § 32.903(a)(5) ("Agency heads– . . . [*m*]*ay* authorize the use of the accelerated payment methods specified at 5 CFR 1315.5.") (emphasis added); 48 C.F.R. §

---

[9]Defendant contends that the PPA applies only to contracts in which "the head of an agency [is] acquiring property or service from a business concern" and not to settlement contracts. 31 U.S.C. § 3902(a); *see FDL Techs., Inc. v. United States*, 967 F.2d 1578, 1581-82 (Fed. Cir. 1992); *Gutz v. United States*, 45 Fed. Cl. 291, 298-99 (1999).

32.908(c)(2) ("agency policies and procedures *may* authorize amendment of paragraphs (a)(1)(I) and (ii) of the clause to insert a period shorter than 30 days (but not less than 7 days) for making contract invoice payments") (emphasis added). Modification P0007 does not incorporate the accelerated payment provisions, 5 C.F.R. § 1315.5 and 48 C.F.R. § 32.908(c)(2), which plaintiff argues should apply. Thus, we must reject plaintiff's argument for interest under these provisions.

If the PPA applies, the parties agree that when the contract does not establish a "specific payment date," then the required payment date is 30 days after receipt of a proper invoice. 31 U.S.C. § 3903(a)(1)(B). Because the settlement contract did not set a specified payment date, plaintiff, therefore, could only collect PPA interest commencing thirty days after the receipt of invoice on July 17, 2006. *See id.*; *id.* § 3902(b).

We need not address defendant's contention that the PPA never applies to settlement agreements. The assumption underlying the penalty provisions of the PPA is that the parties did not otherwise intentionally agree to flexibility in the time period for payment. Here, the parties deliberately refrained from setting a certain date for payment and instead permitted a flexible time period for payment. Despite plaintiff's demand during negotiations for a fixed date beyond which interest would accumulate, the agreement, as endorsed by both parties, merely stated that payment would be made as soon as possible. This intentional use of imprecise language in the settlement agreement as to the payment date is, we believe, fundamentally inconsistent with the underlying assumption of the PPA.

Although not necessary to the result, we also accept the government's argument that the release clause of the settlement independently precludes the present claim. The settlement agreement provided that the "Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments or claims attributable to the facts or circumstances giving rise to the claim." (Def.'s Resp. to Pl.'s Proposed Findings of Fact Att. 1 at 2.) The settlement agreement specified that it was "for the purpose of settlement of contractor's Request for Equitable Adjustment . . . and for interest accrued from date of certification through date of settlement." (*Id.* at 1.) The government argues that this language is broad enough to include the present claim for interest as well as the related claim for expenses and fees.

Plaintiff argues for a narrower interpretation of the release language. According to plaintiff, the release applies only to claims which might have arisen with respect to facts as they stood prior to the settlement and, more specifically, limited to facts connected to the CDA claim submitted in 2000. We find plaintiff's reading of the release unreasonable, particularly in light of the negotiations leading to the omission of any specific due date for payment. In any event, the suggestion that these new claims for interest are not attributable to the facts and circumstances giving rise to the original CDA claim is not plausible. Plaintiff currently seeks interest on the same principal amount agreed upon to resolve the underlying CDA claim. The claim for additional accrued interest is therefore "attributable" to the facts giving rise to the CDA claim made in 2000.

Our construction of the settlement agreement and our holding as to its meaning is dispositive of all counts of plaintiff's complaint. We, therefore, need not address the parties' other arguments.

## CONCLUSION

Because the parties deliberately refrained from setting a date certain and instead agreed to a flexible time period for the settlement payment of plaintiff's CDA claim, we reject the demand for additional interest, fees and costs. Defendant's motion for summary judgment on all issues is granted, rendering its motion to dismiss moot. Plaintiff's cross-motion is denied. The Clerk is directed to dismiss the complaint with prejudice. No costs.

s/ Eric Bruggink
ERIC G. BRUGGINK
Judge